SCHILLINGER *v.* GREENWAY BREWING CO.

*(Circuit Court, N. D. New York.    July 11, 1883.)*

1. PATENTS FOR INVENTIONS—REISSUED PATENT No. 4,364 SUSTAINED—SCHILLINGER PAVEMENT.

    Reissued letters patent No. 4,364, granted to John J. Schillinger, May 2, 1871, for an "Improvement in Concrete Pavements," compared with British patents No. 7,489, of 1837, to Claridge, No. 350, of 1852, to Chesneau ; No. 2,659, of 1855, to Coignet ; No. 771, of 1856, to De La Haichois ; No. 7,991, of 1839, to D'Harcourt ; No. 9,737, of 1843, to Austin ; and United States patents No. 56,503, July 24, 1866, to Huestis ; and No. 5,475, March 14, 1848, to Russ,—and sustained as a patentable invention, not anticipated by said patents.

2. SAME—INFRINGEMENT.

    The Schillinger patent was infringed by the pavement of defendant, and an injunction, and an account of profits and damages, should be decreed.

3. SAME—INVALID CLAIM IN REISSUE.

    The invalidity of a claim in a reissue does not impair the validity of a claim in the original patent which is repeated and separately stated in the reissue.

In Equity.

*Duell & Hey,* for plaintiff.

*John L. King,* for defendant.

BLATCHFORD, Justice.    This suit is brought for the infringement of reissued letters patent No. 4,364, granted to John J. Schillinger, May 2, 1871, for an "improvement in concrete pavements;" the original patent, No. 105,599, having been granted to him, July 19, 1870.    The specification of the reissued patent, reading in the following what is outside of brackets and including what is in italics, and omitting what is inside of brackets, says:

"Figure 1 represents *a plan of* my [pavement in plan view.] *pavement.* Figure 2 is a vertical section of the [pavement.] *same.    Similar letters indicate corresponding parts.*    This invention relates to [pavements for sidewalks and other purposes; and consists in combining with] *a concrete pavement which is laid in sections, so that each section can be taken up and relaid without disturbing the adjoining sections:    With* the joints of *this sectional* concrete [pavements,] *pavement are combined* strips of tar paper, or equivalent material, arranged between the several blocks *or sections* in such a manner as to produce a suitable tight joint, and yet allow the blocks to be raised separately without affecting [or injuring] the blocks adjacent thereto.    In carrying out my invention I form the concrete by mixing cement with sand and gravel, or other suitable [materials] *material,* to form a [suitable] plastic [composition] *compound,* using about the following proportions:    One part, by measure, of cement; one part, by measure, of sand; and from three to six parts, by measure of gravel; [using] *with* sufficient water to [make] *render* the mixture plastic; but I do not confine myself to any *definite* proportions *or materials* for making the concrete composition.    While the mass is plastic I lay or spread the same [upon] *on* the foundation or bed of the pavement either in molds or between movable joists, of the proper thickness, so as to form the edges of the concrete blocks *a, a,* [etc.    When the block *a* has been formed, I take strips of tar paper, *b,* of a width equal or almost equal to the height of the block, and place them up against the edges of the block in such a manner that they form the joints between such block and the adjacent blocks,] *one block being formed after the other.    When the first block has set, I remove the joists or partition between it and the block next to be formed, and then I form*

*the second block, and so on, each succeeding block being formed after the adjacent blocks have set; and, since the concrete in setting shrinks, the second block, when set, does not adhere to the first, and so on; and when the pavement is completed each block can be taken up independent of the adjoining blocks.* Between the joints of the adjacent blocks are placed strips, b, of tar paper, or other suitable material, in the following manner: After completing one block, a, I place the tar paper, b, along the edge where the next block is to be formed, and I put the plastic composition for such next block up against the tar-paper joint, and proceed with the formation of the new block until it is completed. In this manner I proceed [in making all the blocks] until the pavement is completed, interposing tar paper between ['their] *the* several joints, as described. The paper constitutes a tight water-proof joint, but it allows the several blocks to heave separately, from the effects of frost, or to be raised or removed separately, whenever occasion may arise, without injury to the adjacent blocks. The paper [does not adhere] when placed against the [edge of the fully formed] block *first formed, does not adhere thereto,* and therefore the joints are always free between the several blocks, although [adherence may take place between the paper and the plastic edges of the blocks which are formed after the paper joints are set up in place.] *the paper may adhere to the edges of the block or blocks formed after the same has been set up in its place between the joints. In such cases, however, where cheapness is an object, the tar paper may be omitted, and the blocks formed without interposing anything between their joints, as previously described. In this latter case the joints soon fill up with sand or dust, and the pavement is rendered sufficiently tight for many purposes, while blocks are detached from each other, and can be taken up and relaid, each independent of the adjacent blocks.*"

Reading in the foregoing what is inside of brackets and what is outside of brackets, omitting what is in italics, gives the text of the original specification.

The claims of the reissue are as follows:

"(1) A concrete pavement laid in detached blocks or sections, substantially in the manner shown and described. (2) The arrangement of tar paper, or its equivalent, between adjoining blocks of concrete, substantially as and for the purpose set forth."

The original patent had but one claim, as follows:

"The arrangement of tar paper, or its equivalent, between adjoining blocks of concrete, substantially as and for the purpose described."

On the first of March, 1875, Schillinger filed in the patent-office a disclaimer, which, referring to the reissued patent, says:

"That he has reason to believe that, through inadvertence, accident, or mistake, the specifications and claim of said letters patent are too broad, including that of which your petitioner was not the first inventor, and he, therefore, hereby enters his disclaimer to the following words: 'and, since the concrete in setting shrinks, the second block, when set, does not adhere to the first, and so on,' and which occur near the middle of said specification, and to the following words near the end of the specification: 'In such cases, however, where cheapness is an object, the tar paper may be omitted, and the blocks formed without interposing anything between their joints, as previously described. In this latter case the joints soon fill up with sand or dust, and the pavement is rendered sufficiently tight for many purposes, while the blocks are detached from each other, and can be taken up and relaid each

independent of the adjoining blocks. Your petitioner hereby disclaims the forming of blocks from plastic material without interposing anything between their joints while in the process of formation."

This reissued patent was under consideration by the circuit court for the southern district of New York in February, 1877. *Schillinger* v. *Gunther*, 14 Blatchf. C. C. 152. The court (SHIPMAN, J.) gave a construction to it in view of the disclaimer. The defendant's pavement, in that case, had a bottom layer of coarse cement, on which was laid a course of fine cement, divided into blocks by a trowel run through that course while plastic. It possessed the advantage of Schillinger's invention, because any block in the upper course could be taken up without injury to the adjoining blocks. Concrete pavement having been before laid in sections, without being divided into blocks, the invention of Schillinger was held to consist in dividing the pavement into blocks, so that one block could be removed and repaired without injury to the rest of the pavement, the division being effected by either a permanent or a temporary interposition of something between the blocks. It was held that the effect of the disclaimer was to leave the patent to be one for a pavement wherein the blocks are formed by interposing some separating material between the joints; that to limit the patent to the permanent interposition of a material equivalent to tar paper would limit the actual invention; that using the trowel accomplished the substantial results of the invention in substantially the same way devised by Schillinger; that the only difference in result was that the defendant's method left an open joint; that having a tight joint was not a material part of Schillinger's invention; and that the mode of operation involved in using the trowel was within the first claim of the reissue as it stood after the disclaimer.

In the same suit, in August, 1879, the same court (BLATCHFORD, J., 17 Blatchf. C. C. 66) held that the disclaimer took out of the first claim of the reissue only so much thereof as claimed a concrete pavement made of plastic material laid in detached blocks, without interposing anything between their joints in the process of formation, leaving the claim to be one for such a pavement laid in detached blocks, when free joints are made between the blocks by interposing tar paper or its equivalent.

In *California Artificial Stone Paving Co.* v. *Perine*, 20 O. G. 813, [S. C. 8 FED. REP. 821,] in May, 1881, in the circuit court for the district of California, (SAWYER, J.,) the defendant's pavement was made by cutting the lower course into sections with a trowel, and doing the same with the upper course, the upper joint being directly over the lower joint. Into the open joint in each case was loosely put some of the partially set material from the top of the laid course, answering the purpose of tar paper, and leaving the pavement weaker along the joint than in any other place. This was held to be an infringement.

In the present case, it is agreed that the defendant's concrete pavement was constructed as follows:

"The foundation floor, being prepared, has strips or scantlings of wood, 2x4, of sufficient length for the required section, placed in position about 2½ feet out from the coping and parallel therewith. A composition composed of sand, gravel, and cement, made plastic with water, was then spread within the mould formed by the aforesaid scantling, and rammed down so as to come within ½ inch of the scantling. Then a finer course, composed of fine sand and Portland cement, about half and half, made plastic with water, was floated over the coarse material, and smoothed over, or struck off with a straight edge. The block or section was then allowed to set. After becoming sufficiently hardened, the scantling was removed from the outer edge of the block to about the same distance, and parallel with the outer edge of the completed block, and the second block or section formed of coarse material, the same as the first, after which a cutting trowel was drawn across and through the coarse material, along the line of the completed block, and the fine upper finishing course poured in the mold on top of the lower coarse material, and struck off and floated with a straight edge, as in the first block. A straight edge was then applied between the two blocks or sections, over the timber line, and a cutting trowel drawn through the upper course of fine material, over the cut in the coarse material. The edges of the two sections along the cut made by the trowel were then smoothed down with the float or trowel, and the remaining blocks or sections of pavement were formed consecutively in the same way. No tar paper was placed between the blocks."

The only difference between this pavement and that in the *Gunther Case* appears to be that in this case there is an open cut made by a trowel entirely through both courses, the line of the cut in the upper course being directly over the line of the cut in the lower course. In the *Gunther Case* the trowel cut was only through the upper course. It is not stated in the admission in the record as to the mode of the construction of the defendant's pavement, in the present case, that any of the material from the top of the upper course was put loosely into the joint, as in the *Perine Case;* or that the joint was a tight joint, or other than an open joint. Yet, on the cross-examination of the plaintiff's expert, it is proved by the defendant that its pavement is used as a floor in a malt-house, for the storage of malt during the process of malting, and that it is necessary that such a floor should have tight joints. This is confusing, and it is not clear exactly what is meant by the statement, in the admission, that after the cut was made by the trowel through the upper course, the edges of the two sections along the cut were smoothed down with a float or a trowel. If this means that the material from the surface adjoining each edge of the cut was scraped into the cut loosely, and smoothed over the top of the cut, so as to leave a plane surface over the cut, then, by the setting of the material in the cut, the joint was made in a degree a tight joint, and the arrangement was the same in character as in the Perine pavement. In such case there would be a comparatively tight joint made by a substance permanently interposed, yet allowing the blocks to be substantially free, and there would be an infringement of the claim of the original patent. But, independently

of this, under a proper construction of the claim of the original patent and the second claim of the reissue, the interposition of the trowel, effecting the object which it accomplishes, although it is interposed only temporarily, and is not left in permanently, is an equivalent for the tar paper, even though the joint be left open after the trowel is removed, and be not made tight. It may be an advantage to have a tight joint and at the same time a free joint, such as tar paper produces, but the substance of Schillinger's invention is availed of without having the joint tight, if it be free. The plaintiff's expert testifies that the defendant's pavement is a concrete pavement formed in blocks or sections directly on the foundation on which it is to be used, the separation of the blocks being effected by the introduction of the trowel, forming a joint along the line of separation, the joint controlling the cracking of the pavement, and allowing one block to be removed without material injury to the adjacent blocks. This evidence is not contradicted. The second claim of the reissue has, therefore, been infringed, if Schillinger was the first inventor of what it covers.

It is contended that the reissued patent is invalid, because it discards the water-tight feature resulting from the use of tar paper, set forth in the original patent, that unless the paper, or its equivalent in producing a water-tight joint, is permanently interposed in the joints between the blocks, the invention set forth in the original patent is not practiced; and that a concrete pavement with a cut or open joint is not suggested in the original patent. These views are met by the considerations before suggested; and, to whatever extent the reissue might be held invalid in regard to a pavement not covered by its second claim, it was decided by the supreme court, at its last term, in *Gage* v. *Herring*, 2 Sup. Ct. Rep. 819, that the invalidity of a claim in a reissue does not impair the validity of a claim in the original patent which is repeated and separately stated in the reissued patent. That is the present case, and it is unnecessary to determine whether the first claim of the reissue, as amended by the disclaimer, amounts to a claim for anything more than is covered by the second claim of the reissue, or whether such first claim is invalid in any degree. It is not clear that the reissue, as left by the disclaimer, embraces anything of which Schillinger was not the first inventor.

On the question of novelty, the defendant has introduced the following British patents: No. 7,489, of 1837, to Claridge; No. 350, of 1852, to Chesneau; No. 2,659, of 1855, to Coignet; No. 771, of 1856, to De La Haichois; No. 7,991, of 1839, to D'Harcourt; and No. 9,737, of 1843, to Austin; and the following United States patents: No. 56,563, July 24, 1866, to Huestis; and No. 5,475, March 14, 1848, to Russ. No testimony is introduced by the defendant to point out wherein any of these patents are supposed to bear on the invention of Schillinger. But the plaintiff has produced evidence to show that none of them anticipated his invention. The Claridge pavement is not a

concrete pavement, and is not formed in detachable blocks. The Chesneau pavement is formed of a compound which is not such a concrete as that of Schillinger. It is not composed of blocks made detachable to control the line of cracking, but sections of the pavement are set in frames and removably inserted in the surrounding pavement, so as to allow access to gas and water pipes. In the Coignet patent there is not shown a concrete pavement made in detachable blocks in the manner described in Schillinger's patent. In the De La Haichois patent there is no pavement formed in detachable blocks by joints. In the D'Harcourt patent there is nothing to indicate that one section can be removed without disturbing the adjacent sections. In the Austin patent, the pavement is made of wooden blocks, with intervals of an inch and a half in width filled with cement or concrete. The Huestis patent does not show a wearing surface of concrete, or a concrete pavement formed in detachable blocks by joints. The Russ patent shows a concrete foundation for a stone pavement, without joints, and having removable panels, consisting of frames filled with concrete, to be lifted out to give access to water pipes.

It is further contended, that, as plain concrete pavements formed in blocks existed before, there was no patentable invention in making a joint in them. The defect in such pavements is clearly pointed out in the original patent, and repeated in the reissue, that, where there are no free joints between the blocks, they will not heave separately from the effects of frost, and cannot be raised or removed separately without injury to adjacent blocks. No one remedied this defect before Schillinger. His invention was simple, valuable, and patentable. The pavement laid down by Brewster at Syracuse in 1841 had no free joints. Reference is made to the testimony introduced from the case of *Schillinger* v. *Phillip Best Brewing Co.*, in the eastern district of Wisconsin. This testimony was taken in November, 1882. So far as it refers to prior uses in Germany, not shown in a patent or printed publication, it was duly objected to in this case, and must be excluded. As to the cement malt floor which Row laid in Baltimore 25 years ago, he shows that it was not made in sections detachable by free joints. The testimony of Botzler as to a prior malt floor laid by him in Chicago is too indefinite to amount to sufficient evidence to defeat a patent.

The plaintiff is entitled to a decree on the second claim of the reissue, for an account of profits and damages, and a perpetual injunction, with costs.